IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

MIGUEL ANGEL GARCIA,

        Plaintiff,

v.

CORRECTIONS CORPORATION,
OF AMERICA,

        Defendant.

)
)
)
)
)
)
)
)
)
)

No. CIV-19-448-F

## SUPPLEMENTAL REPORT AND RECOMMENDATION

This matter has been referred to the undersigned Magistrate Judge for initial

proceedings consistent with 28 U.S.C. § 636(b)(1)(B).    Defendant CoreCivic, Inc.,[1]

has filed a Motion for Summary Judgment.    Doc. No. 32.    Plaintiff has filed a

Response, Doc. No. 38, and Defendant has replied.    Doc. No. 40.    For the reasons

set forth herein, it is recommended that Defendant's Motion for Summary Judgment

be granted.

    I.    Procedural Background and Claims Presented

Plaintiff is an inmate in the custody of the California Department of

---

[1] CoreCivic was formerly Corrections Corporation of America.

1

Corrections and Rehabilitation ("CDCR").   *See* Complaint, Doc. No. 1-1 at 6-15.[2]
From February 2008 to September 2014, Plaintiff was incarcerated at the North Fork
Correctional Facility ("NFCF") in Sayre, Oklahoma.   During the relevant time
period, Defendant owned and operated NFCF, and some CDCR inmates, including
Plaintiff, were incarcerated there pursuant to an Offender Relocation/Housing
Agreement ("Agreement") between Defendant and the State of California.   *See*
Doc. No. 1-1 at 25-155.

On October 25, 2016, Plaintiff filed a *pro se* Complaint in a California state
court alleging Defendant had provided him with inadequate medical care while he
was incarcerated at NFCF, resulting in misdiagnosis of his medical condition and
ineffective medical treatment.

Based on diversity jurisdiction, Defendant removed the case to the United
States District Court for the Eastern District of California where it was assigned to
Magistrate Judge Edmund F. Brennan.   Thereafter, Defendant moved for change
of venue to this Court pursuant to 28 U.S.C. § 1404(a).[3]   Doc. No. 18.

---

[2] Plaintiff has not amended his Complaint.   Thus, the operative document is attached as Exhibit
A to the Notice of Removal.   Doc. No. 1.   This Court has designated the Complaint as Doc. No.
1-1.

[3] "For the convenience of parties and witnesses, in the interest of justice, a district court may
transfer any civil action to any other district or division where it might have been brought or to
any district or division to which all parties have consented."

2

In his Order granting Defendant's Motion, Judge Brennan cited *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000) identifying factors to be considered when ruling on a § 1404(a) motion for change of venue:

> (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof.

*Order*, Doc. No. 25 at 2.   Judge Brennan granted Defendant's motion, finding transfer of venue to be in the interest of justice based on the availability of compulsory process to compel attendance of non-party witnesses, the ease of access to sources of proof, and the relative congestion in the two courts.   *Id.* at 3-5.

After the cause was transferred to this Court, Defendant moved for summary judgment.   Defendant, without discussion or consideration of which state's laws should be applied to the disposition of this case, contends Plaintiff's claims are barred by his non-compliance with the prerequisites for filing suit mandated by the Oklahoma Governmental Tort Claims Act.   ("OGTCA").   In the alternative, Defendant argues Plaintiff has failed to establish a prima facia case of medical negligence or breach of fiduciary duty.

3

II.     Choice of Law

Because of the procedural posture of this case, this Court must determine whether to apply California law or Oklahoma law in addressing this matter.

"Perhaps no legal subject has caused more consternation and confusion among the bench and bar than choice of law."   Smith, *Choice of Law in the United States* (1987) 38 Hastings L.J. 1041 ("Smith").   "The choice of law decision may determine the success or failure of a lawsuit, the amount of damages recoverable, or the legality of a defense raised."   *Id.* at 1042.

Where, as here, a case is transferred from one forum to another under 28 U.S.C. § 1404(a) for the convenience of the parties, as opposed to a transfer based on lack of jurisdiction, "the transferee court must follow the choice of law rules of the transferor court" in determining which state's law should apply.   *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1532 (10th Cir. 1996) (*citing Van Dusen v. Barrack*, 376 U.S. 612, 635–37 (1964)); *see also Gingeleskie v. Westin Hotel Co.*, 145 F.3d 1337 (9th Cir. 1998) (following transfer of case pursuant to 28 U.S.C. § 1404(a), transferee court must apply choice of law rules of transferor state). Thus, the Court begins its analysis by using California's choice-of-law rules to determine which state's laws should be applied to this case.

California's general choice-of-law rules "'have been formulated by courts

4

through judicial decisions rendered under the common law, rather than by the legislature through statutory enactments.'"   *Chen v. Los Angeles Truck Centers, LLC*, 444 P.3d 727, 730 (Cal. 2019) (*quoting McCann v. Foster Wheeler,* 225 P.3d 516, 524 (Cal. 2010) (collecting cases)).   California law requires application of the "governmental interest test," which requires a three-step inquiry:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.   Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.   Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be the more impaired if its law were not applied.

*Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 922 (Cal. 2006) (internal quotations and citation omitted).

In its Motion to Transfer Venue (Doc. No. 18), Defendant argued strenuously that Oklahoma law should apply to this case.   In fact, Defendant included a full-blown analysis of California's choice-of-law rules, *see* Doc. No. 18 at 7-9, even though the motion before Judge Brennan was for change of venue.   The choice of law to be applied by the transferee court is only tangentially relevant to a decision

regarding change of venue.[4]   In fact, the only possible relevance of Defendant's

choice-of-law argument to the question before Judge Brennan was determining

which state "is most familiar with the governing law," *see supra* at 3, and that factor

is but one of eight.   Moreover, Judge Brennan found transfer of venue warranted

based on the availability of compulsory process to compel attendance of non-party

witnesses, the ease of access to sources of proof, and the relative congestion in the

two courts.   Doc. No. 25 at 4-5.   Judge Brennan specifically stated, "The court

concludes that the remaining factors do not weigh strongly on either retaining or

transferring the case."   *Id.* at 5.   Thus, Judge Brennan did not endorse Defendant's

contention that Oklahoma law should apply to this action, and this Court must make

that decision by applying California's choice-of-law rules.

A.   Negligence under California and Oklahoma Law

It comes as no surprise that the California and Oklahoma substantive laws

regarding the elements of a negligence claim are substantially the same.   In

California, the elements of a cause of action for negligence are: (1) a legal duty to

use reasonable care; (2) breach of that duty; (3) proximate cause between the breach

---

[4] Defendant's emphasis in its discussion of choice-of-law is on differing statutes of limitation and differing caps on damages.   But Defendant does not assert in its Motion for Summary Judgment that Plaintiff's action was untimely filed, and as discussed in further detail below, the State of California's interest regarding damages would seem to be greater than that of the State of Oklahoma.

6

and (4) the plaintiff's injury.   *Mendoza v. City of Los Angeles*, 66 Cal. App. 4th

1333, 1339, 78 Cal. Rptr.2d 525 (1998) (citation omitted).    The same elements are

required to sustain a negligence claim under Oklahoma law:

> Under Oklahoma law, the elements necessary to establish a prima facie
> case of negligence are: "(1) a duty owed by the defendant to protect the
> plaintiff from injury, (2) a failure to properly exercise or perform that
> duty and (3) the plaintiff's injuries are proximately caused by the
> defendant's failure to exercise his duty of care."

*McKellips v. Saint Francis Hosp., Inc.*, 741 P.2d 467, 470 (Okla. 1987) (citations

omitted).    Thus, there is no substantial difference between the negligence laws of

the two states.

### B.    Tort Claims Acts

Both California and Oklahoma have enacted governmental tort claims acts

requiring notice to the governmental entity involved as a prerequisite to bringing a

tort action for monetary damages against the governmental subdivision or its

employees.[5]    There are only slight differences between the notice requirements of

---

[5] Both Oklahoma and California courts have concluded the requirements of their respective tort claims acts are substantive laws that comprise elements of the cause of action.   *See Sisk v. J.B. Hunt Transp., Inc.*, 81 P.3d 55, 62 & n. 1 (Okla. 2003) (Boudreau, J., and Summers, J., concurring in part and dissenting in part) (*citing Cruse v. Bd. of Cnty. Comm'rs of Atoka Cnty.*, 910 P.2d 998, 1004 n. 32 (Okla.1995)) (Oklahoma Governmental Tort Claims Act is a jurisdictional limitation period—a prescribed time period so specifically attached to the subject of the claim that it must be construed as an element of the claim)).   *See also State of California v. Superior Court*, 90 P.3d 116, 120 (2004) (California statutes or ordinances which condition the right to sue the sovereign upon timely filing of claims and actions are elements of the plaintiff's cause of action and conditions precedent to the maintenance of the action).

the California Government Tort Claims Act, ("CGTCA") *see* Cal. Gov't Code,

§§905, 910, 945.4 and the Oklahoma Governmental Tort Claims Act ("OGTCA"),

*see* Okla. tit. 51, §§ 151 et seq.

The CGTCA requires the following notification to the governmental entity

being sued:

> A claim shall be presented by the claimant or by a person acting on his or her behalf and shall show all of the following:
>
> (a) The name and post office address of the claimant.
>
> (b) The post office address to which the person presenting the claim desires notices to be sent.
>
> (c) The date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted.
>
> (d) A general description of the indebtedness, obligation, injury, damage or loss incurred so far as it may be known at the time of presentation of the claim.
>
> (e) The name or names of the public employee or employees causing the injury, damage, or loss, if known.
>
> (f) The amount claimed if it totals less than ten thousand dollars ($10,000) as of the date of presentation of the claim, including the estimated amount of any prospective injury, damage, or loss, insofar as it may be known at the time of the presentation of the claim, together with the basis of computation of the amount claimed. If the amount claimed exceeds ten thousand dollars ($10,000), no dollar amount shall be included in the claim. However, it shall indicate whether the claim would be a limited civil case.

Cal. Gov't Code § 910.

> The OGTCA states in relevant part:

> The written notice of claim to the state or a political subdivision shall state the date, time, place and circumstances of the claim, the identity of the state agency or agencies involved, the amount of compensation or other relief demanded, the name, address and telephone number of the claimant, the name, address and telephone number of any agent authorized to settle the claim. . ..    Failure to state either the date, time, place and circumstances and amount of compensation demanded . . ., **shall not invalidate the notice unless the claimant declines or refuses to furnish such information after demand by the state or political subdivision.**

Okla. Stat. tit. 51, §§ 156 and 157.

California notice requirements do not include disclosure of the amount of compensation claimed if the amount is over $10,000.   The Oklahoma notice requirements include notice of the claimed compensation, regardless of the amount. But the Oklahoma statute also specifically states that notice is not invalidated by the claimant's failure to include all information specified, so long as the claimant complies with a defendant's request for additional information.   There are no practical differences between the OGTCA and the CGTCA

> C.    Differences in Laws Governing Award of Damages

The major differences in California and Oklahoma law pertains to limitations on noneconomic damages.

California law allows a plaintiff to recover for noneconomic and actual losses. Cal. Civ. Code § 3333.2; *Chan v. Curran*, 237 Cal. App.4th 601, 616 (Cal. App. 2015) (there is no limitation on the recovery of actual damages and only a partial limitation on the recovery of noneconomic damages).    Noneconomic damages include pain and suffering, inconvenience, physical impairment, disfigurement, and other nonpecuniary damages, and such losses shall not exceed $250,000.    *Id.* California does not place a cap on actual losses.    *Id.*

Under Oklahoma law, there is no limitation on the amount of damages that may be awarded for economic losses.    Okla. Stat. tit. 23, 61.2(A).    Noneconomic damages are capped at $350,000.    Okla. Stat. tit. 23, § 61.2 (B).    Oklahoma law eliminates the cap entirely in the event of gross negligence.    Okla. Stat. tit. 23, §61.2(C).

D.    Conclusion

Having determined there are some differences in the amount of damages a successful plaintiff can obtain under California law as opposed to Oklahoma law, this Court must apply California's choice-of-law rules to determine the nature and strength of the interest of each jurisdiction in the application of its own law and which state's interest would be more impaired if its policy were subordinated to the policy of the other state.

Having applied the requisite factors, this Court concludes that California has a significantly greater interest than Oklahoma has in having its laws applied to the disposition of this case.   Plaintiff a resident of California held in the custody of CDCR.   Defendant is a corporation with a contractual relationship with CDCR, the terms of which delegate to Defendant the healthcare of California prisoners housed in Defendant's facilities.   Neither the State of Oklahoma, itself, nor any Oklahoma citizen is a party to this action.   California has an interest in compliance with the notice requirements set forth in the California Government Tort Claims Act.   In this case, Oklahoma has no such interest as no Oklahoma governmental entity is liable for any potential damages.   And finally, California has an interest in application of its laws limiting damages in a governmental tort action.

In sum, this Court concludes that California has the materially greater interest in having its laws applied to this case.   With these laws in mind, the Court now considers Defendant's Motion for Summary Judgment.

III.   <u>Analysis</u>

A.   <u>Standard of Review</u>

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   In considering a motion for summary

judgment, the court must view the facts and inferences drawn from the record in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006) (quotation omitted). While the court liberally construes a pro se plaintiff's complaint, such a plaintiff must adhere to the same rules of procedure that are binding on all litigants. *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007). Thus, strict adherence by a pro se plaintiff to the requirements of Fed. R. Civ. P. 56 is required. With respect to those requirements, the Supreme Court has determined that

> the plain language of Rule 56 . . . mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

### B.    Compliance with Notice Requirements of OGTCA[6]

Defendant first contends it is entitled to summary judgment because Plaintiff failed to include the amount of compensation he was seeking in his notice to Defendant and that, therefore, his action is barred by the OGTCA. Having

---

[6] A copy of Plaintiff's Notice of Claim, made in compliance with the CGTCA, is attached to Defendant's Motion as Attachment 6, Doc. No. 32-6.

12

determined that California law should apply, however, this Court rejects this argument.   As discussed above, the CGTCA does not require such a disclosure when, as here, the claimant is seeking more than $10,000 in compensation.   *See* Doc. No. 1-1 at 7 (demanding $2,000,000).

The Court notes, however, that the notice Plaintiff gave Defendant under California law would be adequate under Oklahoma law too, unless Defendant sought information concerning the amount of damages at issue and Plaintiff refused to provide the information.   *See* discussion *supra* at 9.   Defendant has included no facts to suggest it requested more information from Plaintiff or that any such requested information was not provided.   Thus, Defendant is not entitled to summary judgment based on any perceived deficiency in the notice it received before Plaintiff filed suit.

### C.   Medical Negligence

The crux of Plaintiff's negligence claim is that after numerous tests and examinations, health providers to whom Defendant referred Plaintiff misdiagnosed him with Coccidioidomycosis, also known as "valley fever."   After he was transferred back to California, Plaintiff was ultimately diagnosed with Neurocysticercosis, also known as "neuro tape worm."   According to Plaintiff, the misdiagnosis resulted from negligence.   As explained below, however, the

differential diagnosis of valley fever was a reasonable conclusion that does not in any way indicate negligence on the part of Defendant or the medical providers to whom Plaintiff was referred.

Plaintiff does not contest the accuracy of the material facts Defendant sets forth in the first thirty-two pages of its Motion for Summary Judgment.   Therein, Defendant documents the medical care Plaintiff received while he was incarcerated in NFCF, the medical treatment he received after his transfer to La Palma Correctional Center ("LPCC") in Elroy, Arizona, where he was incarcerated from September 4, 2014 to September 17, 2014, and the medical treatment he received at the CDCR Medical Center in Stockton, California, where Plaintiff is currently incarcerated.

Verified medical records from NFCF are attached to Defendant's Motion as Attachment 1, Doc. No. 32-1.   Verified medical records from outside sources to which Plaintiff was referred by Defendant while he was still at NFCF are also attached to Defendant's Motion.   *See* Jackson City Memorial Hospital Records, Doc. No. 32-2; Dean McGee Eye Institute Records. Doc. No. 32-3; and OU Medical Center Records, Doc. No. 32-4.   The CDCR medical records comprise Attachment 5, Doc. No. 32-5.

In addition to the medical records, Defendant has produced verified affidavits

from two physicians who have first-hand knowledge of the medical care Plaintiff received both during and after his incarceration at NFCF.    Dr. K. Ivens, M. D., and Dr. J. K. Olson-Garewal, M.D., are well-qualified to identify the standard of care for healthcare providers in cases, like this one, where a patient's symptoms could be caused by numerous different conditions.    *See* Declaration of Dr. K. Ivens, Doc. No. 32-7, ("Ivens Decl.)" and Declaration of J.K. Olson-Garewal, M.D., Doc. No. 32-8, ("Olson Decl.").[7]

Both Dr. Ivens and Dr. Olson identify "differential diagnosis" as the standard process medical care providers use to develop a working diagnosis when the cause of a person's symptoms can result from different disease processes.    *See* Ivens Decl. at 4; Olson Decl. at 3-4.    A "differential diagnosis" is a patient-specific process of elimination that medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes.    *Stanley v. Novartis Pharm. Corp.*, 11 F. Supp. 3d 987, 1000–1001 (C.D. Cal. 2014) (quotations and citations omitted).    The first step in the diagnostic process is to compile a

---

[7] It should be noted that Plaintiff has produced no evidence or expert testimony to counter Defendant's argument.    Plaintiff contends he cannot produce such evidence without counsel. The Court concludes, however, that even if Plaintiff were appointed counsel, any further evidence counsel could produce in the way of expert testimony would be redundant.    Defendant's evidence overwhelmingly supports but one conclusion: that Defendant did not breach its legal duty to provide Plaintiff with adequate medical care.

comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration.  *Id.*   The second step requires the medical provider to engage in a process of eliminating or ruling out the identified potential causes to develop a working diagnosis.  *Id.*   The patient is then treated based on the working diagnosis.   If the treatment is not successful, medical providers re-evaluate the working diagnosis to develop another diagnosis.   Olson Decl. at 3-4.   This is precisely the process Plaintiff's medical providers used.

Plaintiff's initial health screening upon arrival at NFCF, revealed chronic medical problems including high blood pressure and high cholesterol.   Doc. No. 32-1 at 145-147.   During his stay at NFCF, he was also diagnosed with and treated for thyroid disease.   Ivens Decl. at 6.   *See also* Doc. No. 32-1 at 72.   Plaintiff's complaints generally included headaches, dizziness and nausea.   *See*, e.g. Doc. No. 32-1 at 852; 857; 936.   On February 18, 2013, Plaintiff reported vision problems.   *Id.* at 743.   These symptoms can be attributed to overlapping medical conditions including Neurocysticercosis and Coccidioidomycosis, but they can also be attributed to chronic conditions such as hypertension, subclinical hypothyroidism, and the side effects of medications used to treat chronic conditions.   Ivens Decl. at 10.

Dr. Ivens examined Plaintiff on April 4, 2013, and noted Plaintiff had

hypertension which can cause severe headache, vision problems, fatigue, difficulty breathing and dizziness.   Ivens Decl. at 4-5.   At that time, Plaintiff had stopped taking Hydrochlorothiazide and Enalapril, the two medications he had been prescribed for hypertension, because he decided, on his own, that his blood pressure was too low.   *Id.* at 5.   Dr. Ivens avers that these medications, as well as Omeprazole prescribed for acid reflux, can cause side effects such as vision problems, nausea, vomiting, dizziness, numbness and tingling.   *Id.*   Plaintiff reported his dizziness had stopped after he quit taking the Hydrochlorothiazide and Enalapril.   Dr. Ivens generated a list of medications for Plaintiff and scheduled a follow-up visit.   *Id.*

But Plaintiff returned to the medical unit on April 10, 2013, complaining of four episodes of numbness in his lower extremities.   Dr. Ivens again examined Plaintiff, and based on the new symptoms and the earlier report of visual disturbances, Dr. Ivens referred him for an MRI of the brain and spinal cord to test a possible differential diagnosis of multiple sclerosis or neurological disease.   Dr. Ivens also ordered a blood test to measure the amount of thyroid stimulating hormones ("TSH") in Plaintiff's blood, and an EKG.   *Id.* at 5-6.   The MRI results did not detect any serious intracranial or spinal cord issues.   *Id.* at 6; *see also* Doc. No. 32-1 at 447; Doc. No. 32-2 at 3.   Based on the results of the TSH test, Dr. Ivens

17

diagnosed subclinical hypothyroidism which could account for some of Plaintiff's symptoms.   Ivens Decl. at 6; Doc. No. 32-1 at 72.   Plaintiff was treated with Levothyroxine Sodium for thyroid hormone support.   Levothyroxine Sodium can also cause symptoms including headache, abdominal cramps, sweating, weight loss, diarrhea and increased appetite.   Ivens Decl. at 6.

On August 4, 2014, Plaintiff reported to the medical unit complaining of right upper quadrant pain—pain beneath the ribs—and headache.   Dr. Ivens ordered that Plaintiff be placed under medical observation.   *Id.*   Dr. Ivens saw Plaintiff on August 5, 2014.   *Id.* at 7.   Plaintiff reported that his pain had resolved.   Dr. Ivens ordered another TSH test, and Plaintiff was started on a lower dose of Levothyroxine Sodium.   *Id.*   On August 6, 2014, Plaintiff again complained of right upper quadrant pain and nausea.   He also reported he had vomited one time, but stated his pain had resolved in ten minutes.   *Id.*   But because right upper quadrant pain could result from liver or gallbladder disease, Dr. Ivens ordered a white blood count to rule out infection.   *Id.*

Plaintiff went to an optometrist appointment at Dean McGee Eye Institute on August 20, 2014.   Doc. No. 32-3.   The examination revealed optic nerve swelling. The differential diagnosis included obstructive hydrocephalus, IIH, infiltration and infectious process.   The medical notes stated Plaintiff needed urgent brain imaging,

18

even though the previous brain MRI was negative.    Doc. No. 32-3 at 7.    Plaintiff was immediately transferred to the University of Oklahoma Medical Center for further care.    OU Medical personnel performed a CT scan of Plaintiff's brain. The result was "[n]o acute intracranial pathology demonstrated."    Doc. No. 32-4 at 3.    OU personnel also performed a spinal tap which revealed elevated proteins but clear fluids.    Ivens Decl. at 8.

Ultimately, OU medical personnel ruled out meningitis and tuberculosis.    At that point, the working diagnosis was Coccidioidomycosis, or valley fever, a lung infection caused by a fungus that grows in the soil in Arizona, the southern and central parts of California, and portions of Nevada, New Mexico, Texas and Utah.[8] Dr. Ivens states that symptoms of valley fever include fatigue, shortness of breath, headache, nausea, vomiting, muscle aches, dizziness and pressure behind the eye. Ivens Decl. at 9.    OU physicians prescribed Fluconazole/Diflucan, an anti-fungal medication used to treat valley fever. *Id.*

Although neither the cerebrospinal fluid ("CFS") nor the Cocci blood tests proved positive for valley fever, OU medical personnel did not rule out that diagnosis because the tests are often negative even when the person has the infection.

---

[8]  Plaintiff was originally from Mexico and had lived in the San Joaquin Valley.    Olson Decl. at 7.

Doc. No. 32-4 at 15.    Moreover, Plaintiff's symptoms were consistent with symptoms of valley fever, and the San Joaquin Valley, where Plaintiff had lived, is the "valley" after which "valley fever" is named.    Olson Decl. at 7.

Shortly after his examinations at the OU Medical Center, Plaintiff was transferred to LPCC for a short stay before being transferred to CDCR Medical Center.    While at LPCC, Dr. Olson saw Plaintiff several times.    She also contacted the infectious disease specialist from the OU Medical Center who verified Plaintiff had undergone numerous tests including CT of the abdomen, imaging of the head, HIV, hepatitis, Histoplasma antigen, RPR to detect syphilis, crypto and histo antigen stool exam to detect a parasitic infection, and a tuberculosis PCR.    All were negative.    An acid-fast smear checking for mycobacterial infection and tests for valley fever were pending.    Olson Decl. at 4-5.    As valley fever was the principle working diagnosis developed at the OU Medical Center, Dr. Olson continued treatment for that disease, but she also contacted the CDCR Medical Department where Plaintiff was to be transferred and advised them that he needed to be seen and evaluated as soon as he arrived because of the papilledema.    Plaintiff was transferred to the CDCR Medical Center on September 17, 2014.    At that point, Defendant no longer was responsible for Plaintiff's medical care.

On June 10, 2015, Plaintiff was admitted to Mercy Hospital at Bakersfield,

California, for further testing.   For the first time, a CT scan clearly revealed two cysts that were putting pressure on the brain stem and cerebellum.   At that point, Plaintiff was diagnosed with Neurocysticercosis.

Neurocysticercosis is a specific form of Cysticercosis ("tape worm"), a rare infectious disease of which only about 1,000 cases are reported annually in the United States.   The disease is most common in Mexico and South America.   The evidence demonstrates that Neurocysticercosis is very hard to diagnose.   Besides the rarity of the disease, the symptoms can be identical to those of valley fever and other conditions.   Olson Decl. at 6-7.

Neurocysticercosis can be contracted by consumption of raw or undercooked pork, residing or traveling in endemic countries, and exposure to cattle or livestock. Moreover, the time between the initial infection and the onset of symptoms can vary from several months to many years.   The disease is diagnosed by CT scan or MRI imaging revealing cysts.   *Id.* at 8.   Despite the numerous medical tests provided by Defendant, including MRIs and CT scans, no evidence of Neurocysticercosis was discovered until cysts in Plaintiff's brain developed and were detected almost one year after he was transferred from Defendant's facilities.

The evidence Defendant has produced supports only one conclusion—that the medical providers associated with Plaintiff's care were not negligent.   To the

21

contrary, the number of tests and scans performed in an attempt to isolate the cause of Plaintiff's symptoms indicates the medical providers to whom Plaintiff was referred diligently worked to unravel the medical mystery he presented.   But an accurate diagnosis depended on a brain scan indicating the presence of cysts in the brain.   The brain scans performed while Defendant was responsible for Plaintiff's medical care did not demonstrate the presence of such cysts.   The evidence produced by Defendant proves that neither Defendant nor any of its medical providers breached any duty with regard to Plaintiff's medical care.   In sum, Defendant's Motion for Summary Judgment should be granted.

## RECOMMENDATION

Based on the foregoing findings, it is recommended Defendant's Motion for Summary Judgment (Doc. No. 32) be GRANTED.   The parties are advised of their respective right to file an objection to this Supplemental Report and Recommendation with the Clerk of this Court by ___October 24th___, 2019, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72.   The failure to timely object to this Supplemental Report and Recommendation waives appellate review of the recommended ruling.   *Moore v. United States of America*, 950 F.2d 656 (10th Cir. 1991); *cf. Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendation are

deemed waived.").

This Supplemental Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this   4th   day of ____October, 2019.


GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE